## DOLE, *Administrator, versus* LINCOLN.

To constitute a donation, *inter vivos*, there must be a gift absolute and irrevocable, without any reference to its taking effect at some future time.   The donor must deliver the property, and part with all present and future dominion over it.

To constitute a *donatio causa mortis*, the gift must be made in contemplation of the near approach of death, and to take effect absolutely, *only* upon the death of the donor.   There must be a delivery of the property to the donee, or some other person, for his use.   The donor must part with all dominion over it, so that no further act of him, or of his personal representative, is necessary to vest the title perfectly in the donee, should it not be reclaimed by the donor during his life.

To constitute a valid *donatio causa mortis*, the donor must part with all dominion over the property to the donee, to belong to him presently, *as his own property*, in case the donor should die without making any change in relation to it.

Such an alienation of property cannot be supported in law, if it be intended, not for the benefit of the donee, but as a trust fund to be dispensed for benevolent uses, at the entire and unlimited discretion of the donee.

Donations, not made in conformity to the statutes of wills and of frauds, but rather suited to contravene them, are not favored by the law.   They are admitted with the greatest caution.

TROVER against Rodney G. Lincoln, for certain promissory notes, amounting to nearly $5000.   It was admitted, that before the commencement of the suit, the plaintiff had demanded the notes of the defendant, who refused to deliver them.

*William Stickney*, called by the plaintiff, testified as follows : — "The notes were the property of Ebenezer Dole, the plaintiff's intestate, who died June 9, 1847; on June 3, 1847, the intestate, in his sick chamber, requested me to make a schedule of notes, which he wanted to give, or had given for benevolent purposes, (whether he said he had then placed them or given them into the hands of Lincoln, defendant, cannot say,) to be distributed by certain persons named, as

they thought best, after his decease. I said to him, "I suppose you understand this is not a legal transaction ;" he said, "my family understand it, and will comply with my wishes in regard to it ;" I made out the schedule. [NOTE. — The heading of the schedule is thus : — " Hallowell, June 3, 1847. The following is a list of notes, which I, Ebenezer Dole, wish to have deposited with R. G. Lincoln, the proceeds of which to be distributed according to the discretion of Rev. David Thurston, Austin Willey, R. G. Lincoln and William Stickney, to objects of benevolence, which, in the judgment of all, or a majority of the above persons think it will accomplish the most good." The list amounted to $4904,33. It included a note against said Stickney and several notes against Simon Page.] He wished me to act as one of the trustees to distribute the proceeds, and I consented to do so. When I made the writing, Simon Page was named as one of the trustees. I cannot tell why his name was not put into the paper.

*Cross-examined.* The paper was not signed by him, because he wished to make the sum exactly $5000. He became more sick soon afterwards, and never completed it. If the schedule, instead of the words, "wish to have deposited," had stated, that my note and Page's notes were in the hands of Lincoln, the ideas he communicated to me would have been as accurately expressed in the paper as I can recollect them. The intestate was conscious that he was very near his end, but did not, as I can now recollect, speak of it at the time of the conversation. He left a widow, and one son and three daughters, also a niece, who had been brought up in his family.

*Austin Willey,* called by the defendant, was objected to, but was admitted as a witness, and testified as follows : — I was present when some of the notes were indorsed and delivered to the defendant. The intestate said he had given certain notes to Mr. Lincoln, as one of several trustees, to be appropriated to purposes of benevolence according to their own judgment of his wishes and feelings, as he would do were he living. There was at least one note indorsed and

added to those that had previously been given. He express-
ed an intention to add something more to the fund by other
notes. He informed me, that he had conversed with the per-
sons named as trustees, and requested them to act in his be-
half, and that they had consented to do so. I also consented.
This was some two or three weeks before his death, he then
had no expectation of recovery, expected soon to die. He
told me he had requested Simon Page to act as one of the
trustees, and that he would do so.

*Cross-examined.* — He requested Mr. Lincoln to get a file
of papers for him out of his desk. This conversation was in
his sick chamber, and the desk was there. The intestate
selected a note from the file, and indorsed it. It was signed
by William Stickney for $500, payable to the intestate. He
said the other notes were in Mr. Lincoln's hands; that they were
notes against William Stickney and Simon Page. At an in-
terview a short time before, he told me he had placed notes in
Mr. Lincoln's hands, for the purposes before stated. He said
he wished to see Mr. David Thurston of Winthrop, and de-
sired me to send for him, and I did so.

*Simon Page*, called by defendant, (objected to, but admit-
ted,) testified — I had a conversation with the intestate a few
days before his death; he asked me to act as one of the trus-
tees of this fund, and I consented.

*Cross-examined.* — It was in his chamber — do not know
that any other person was present — he said he wished to
leave a certain amount of property for charitable purposes, and
wished me to consent to be one of the trustees. I think he
named the amount, but I do not now recollect it. It was to
be left to the disposal of the trustees.

The statement of Rev. David Thurston, received by con-
sent as evidence, was in substance, as follows : —

On July 27, 1846, the intestate informed me he had
made what he considered a suitable provision for his family,
and had set apart a portion of his estate for the promotion of
the same objects which he had been accustomed to promote :
viz. the cause of truth and righteousness, and wished the fund

to be used after his death, in an unostentatious way, for that purpose. As I understood his views, he requested me, with a few others, whom he named, to receive in trust such property as he might leave for this purpose, and that we should appropriate the avails of it to the furtherance of such objects as we might judge he would approve, if living.

At a subsequent interview, he told me he had added William Stickney to the number of the trustees.

The inventory of the intestate's estate was, real, $2060,00, personal $14,792,82, including the notes in controversy.

The case was submitted to the court upon this testimony, or so much thereof as may be legal, and if the plaintiff cannot maintain the action, it is to be entered for trial, that the sanity of the intestate, and the circumstances attending the transaction, may be determined by a jury. If it can be maintained, defendant is to be defaulted.

*Evans*, for the plaintiff.

The defendant is not entitled to hold the notes sued for, either as being a gift *inter vivos*, or as a *donatio causa mortis.* Not the former, because it was not to take effect until after the death of the intestate ; not the latter, because it was not made in contemplation of immediate death.

It was evidently an attempt to make a testamentary disposition of property, long considered and designed, which might and should have been made conformably to the statutes, and was so understood by the intestate. Its validity was to depend on the consent of his family. This shows it was not a *death-bed* disposition. Such dispositions of property are allowed only when there is no time to make them in the formal and solemn manner required by law. 2 Kent's Com. 444, and seq. ; *Weston* v. *Hight,* 5 Shep. 287.

The gift is void for uncertainty as to the purposes to be accomplished, and as to the persons to be benefited. It is not a gift to charitable uses, none being such except those enumerated in stat. 43, Eliz. c. 4 ; *Saunderson* v. *White,* 18 Pick. 333.

It is void also, there being no mode of enforcing the trust

attempted to be created, and the law will not uphold what it cannot enforce. There is no mode provided for administering the fund after the death of the persons named; no succession; the trust to them was personal.

If the stat. Elizabeth is in force here, *quod dubitatur*, still it does not cure nor obviate this difficulty; this being no devise, bequest, or legacy; and it is only by that statute that similar vague descriptions of purpose have been deemed capable of being supported.

It is also contended, that Willey was not admissible as a witness, being interested. *Borneman* v. *Sidlinger*, 15 Maine, 227.

In absolute gifts, the donor must part, not only with the *possession* but the *dominion* of the property; which was not done here. The donees were to have no control of it until after the death of the donor. 2 Esp. R. 643; *Noble* v. *Smith*, 2 Johns. 52.

*S. Fessenden*, for defendant.

The intestate was a gentleman of wealth.

There are no creditors to complain of any disposition, which he might make of his property. The right of its disposal was entirely with him. He made the gift; every thing necessary to the perfection of it, was done. The notes were delivered, and the intention of the donor was clearly and unequivocally expressed, and the notes were indorsed, and placed in the hands of the donee by the intestate, and accepted by the donee. The gift was absolute, and was perfected. The persons designated were to do with the property, as they pleased. This suit pre-supposes the notes to be in the defendant's hands. They were there rightfully, by delivery of the owner, who had no power to revoke the gift. *Grover* v. *Grover*, 24 Pick. 261.

The title had passed, and there was a donation "*inter vivos.*"

But if not so, there was a good *donatio causa mortis*. It was made in deep sickness, in view of the near approach of death, and had all the elements of an effectual gift.

Gifts to charitable uses are highly favored in law, and will be most liberally construed, in order to accomplish and carry into effect the intent and purpose of the donor. Trusts, which cannot be supported in ordinary cases, for various reasons, will be established and carried into effect, where the trust is raised in support of a gift, to a charitable use. If no executor or trustee is named, in ordinary cases the gift would fail, but in cases of charity, the want will be supplied by appointment by a court of equity. *Saunderson* v. *White,* 18 Pick. 328.

But the distinction most material to the present case is this, that where the purposes of the gift are vague and uncertain, the gift will be either declared void for uncertainty, or, if the gift and the trustee be sufficiently explicit, but the object of the trust vague and uncertain, it will be declared, in ordinary cases, a resulting trust for the heirs-at-law or distributees.

But, *in case of a gift to charitable uses,* this will never be done. In all such cases, the legacy will be sustained. *Mills* v. *Farmer,* 1 Merivale, 54; *Parish* v. *Stone,* 14 Pick. 198; *Borneman* v. *Sidlinger,* 15 Maine, 429.

The case of *Weston* v. *Hight,* 17 Maine, 287, was unlike this, and does not conflict with the position we maintain.

There is no uncertainty in the donation. It is sufficient that he make the designation of *charitable purposes.* And he might well confide in the discretion of the donees.

It was not designed to establish a permanent fund, the interest of which should be appropriated for charitable purposes. It is a gift to be used by the donees at their discretion, as well principal, as interest. No perpetuity was contemplated. The whole gift was to be expended by the donees.

The gift is *donatio causa mortis* to the individuals named, and there is no designation, other than such a charitable appropriation of the fund as their own discretion should dictate. Would it not be a good *donatio causa mortis,* to give a sum of money to a man to spend at his discretion in the cause of good morals? Or for the purposes of charity?

But, were the object of the donation uncertain to some extent, and were it designed as a permanent fund, there would

be found enough in the case to authorize the court to compel the donees to make such a disposition of the fund as would meet the intentions of the donee.

*Evans*, in reply.

The trustees were to have no control of the fund until after the intestate's death. It therefore was not a donation *inter vivos*. Neither was it valid as a donation *causa mortis*. It was mere purpose, long formed, to dispose of property without a will.

The gift is void for uncertainty. It does not pretend to be for the benefit of the persons named.

Gifts to charitable uses are only sustainable by virtue of Stat. 34, Eliz. c. 4. Parol gifts are not within it. But if this disposal of the property were by will, it could not be sustained. Here are no *cestuis que trust*, and courts can appoint none.

It is said charities are to be favored. This is an English rule, arising out of the prerogative of the King, as *parens patriæ*. 3 Black. Com. Book 3, c. 27, § 3.

Still gifts to charities are looked upon with suspicion. 2 Kent, 444, says they are of *dangerous* nature. *Wheeler* v. *Smith & al.* 8 Howard.

SHEPLEY, C. J. — The testimony shows, that the notes claimed in this suit, were formerly the property of the intestate, and that they must still be regarded as belonging to his estate, unless he made a legal disposition of them during his life.

To constitute a donation *inter vivos*, there must be a gift absolute and irrevocable, without any reference to its taking effect at some future time. The donor must deliver the property, and part with all present and future dominion over it. *Grover* v. *Grover*, 24 Pick. 261.

The testimony clearly shows, that the intestate did not intend to make a gift of the notes to take effect immediately, without reference to his decease.

To constitute a *donatio mortis causa*, the gift must be

made in contemplation of the near approach of death to take effect absolutely only upon the death of the donor. *Ward* v. *Turner*, 2 Ves. Sen. 431; *Tate* v. *Hilbert*, 2 Ves. Jr. 111; *Borneman* v. *Sidlinger*, 15 Maine, 429; *Parish* v. *Stone*, 14 Pick. 198; *Raymond* v. *Sellick*, 10 Conn. 480.

There must be a delivery of the property; but a delivery to the donee, or to some other person for his use, will be sufficient. *Drury* v. *Smith*, 1 P. Wms. 104; *Wells* v. *Tucker*, 3 Binn. 366; *Contant* v. *Schuyler*, 1 Paige, 316; *Borneman* v. *Sidlinger*, 15 Maine, 429.

The donor must part with all dominion over the property, so that no further act is required of him, or of his personal representative, to vest the title perfectly in the donee, if it be not reclaimed by the donor during his life. *Hawkins* v. *Blewitt*, 2 Esp. 663; *Bunn* v. *Markham*, 7 Taun. 224; *Reddel* v. *Dobree*, 10 Simons, 244. An essential difference between a legacy and a *donatio mortis causa*, consists in the independence of the title of the donee of any act or consent of the legal representative. 1 Roberts on Wills, 7, note 5. Such donations " are properly gifts of personal property by a party, who is in peril of death, upon condition, that they shall presently belong to the donee in case the donor shall die, but not otherwise. 1 Story's Eq. § 606.

To establish a valid *donatio mortis causa*, the testimony in this case must prove, that the intestate parted with all dominion over the notes, by a gift of them to the persons named as donees, to belong to them presently as their own property, in case he should die without making any change.

William Stickney, one of the donees, called by the plaintiff, testifies, that the intestate, on June 3, 1847, requested him to make a schedule of notes, " which he wanted to give, or had given, for benevolent purposes; whether he said he had placed them or given them into the hands of Lincoln, (defendant,) cannot say, to be distributed by certain persons named, as they thought best, after his decease."

The witness produced the schedule then made by him, and stated, if instead of the words, " wish to have deposited," used

in the schedule, the paper had stated, "my notes and Page's notes were in the hands of Lincoln, the ideas, he communicated to me, would have been as accurately expressed in the paper, as I can recollect them." By making the change of language proposed by the witness, as nearly as may be, the language of the paper preceding the list of notes, would read as follows: — " The following is a list of notes which I, Ebenezer Dole, so far as it respects the notes of William Stickney and Simon Page, have placed in the hands of R. G. Lincoln, the proceeds of which to be distributed according to the discretion of Rev. David Thurston, Austin Willey, R. G. Lincoln and William Stickney to objects of benevolence, which in the judgment of all or a majority of the above named persons, think it will accomplish the most good."

It will be perceived, that the word placed, and not the word given, has been substituted for the word deposited, used in the schedule. The reason for this is, that the witness states, that he cannot say, whether the intestate said, he had " placed them or given them into the hands of Lincoln." The burden of proof to establish a gift is upon the defendant, and when the witness is uncertain, which word was used, there is no proof, that the word given was used, and no authority is therefore found for its use, to correct the written paper. And when the witness states how it should be corrected, he says, it should state, instead of their being deposited, that they " were" in the hands of Lincoln. The paper, therefore, with the change of language made, will state the whole legal effect of the testimony of the witness, and the intentions of the intestate at that time, will be better and more satisfactorily ascertained, than by the witness's recollection of his words spoken.

*Austin Willey,* called by defendant, testifies in substance, that two or three weeks before his death he was in the chamber of the intestate, who asked the defendant to hand him a file of papers from his desk, that after it was handed to him, he took out a note bearing date on April 15, 1846, for $500, signed by William Stickney, and payable to the intestate, and indorsed his name upon the back of it and

delivered it to the defendant, to be added " to those that had previously been given." That the intestate at that time said, " he had given certain notes to Mr. Lincoln, as one of several trustees named, to be appropriated to purposes of benevolence or charity according to their own judgment of his wishes and feelings, as he would do, were he living." He also states, " at an interview a short time before, he told me he had placed notes in Mr. Lincoln's hands for the purposes before stated."

The intestate died on June 9, 1847, this transaction must therefore have taken place before the schedule was made by Stickney.

*Simon Page,* called by defendant testifies, that he had a conversation with the intestate a few days before his death, when he said " he wished to leave a certain amount of property for charitable purposes, and wished me to consent to be one of the trustees."

It was agreed, that a certificate signed by the Rev. David Thurston, respecting his consenting to act as one of the trustees should be received as evidence. He states in that certificate, that he had a conversation with the intestate on July 27, 1846, when he stated, that " he had made suitable provision for his family, and had set apart a portion of his estate, for the promotion of the same objects which he had been accustomed to promote : viz. the cause of truth and righteousness." " As I understood his views, he requested me with a few others, whom he named, to receive in trust such property, as he might leave for this purpose, and that we should appropriate the avails of it to the furtherance of such objects, as we might judge he would approve, if living."

If this testimony were all to be considered as legal, when considered together, the effect is rather to prove, that he designed to entrust the property to them, to be used after his decease, for the purposes selected by them, than to be held by them as their own property, as a free gift from him. Several considerations strongly operate to convince the mind, that his intention was not to make a donation to them as men, but

to place so much of his property in their hands, as trustees, to be distributed. They are uniformly spoken of, or referred to by him, as trustees. According to the statement of Mr. Thurston, many months before his decease he expressed an intention " to leave a certain amount of his property for charitable purposes." There is no proof from any person, that he at any time actually made a donation, of the notes to the persons named. At most it can only be inferred that he had done so, from his declarations of what he had done. The word, give or given, as ordinarily used in conversation, does not necessarily convey the idea of a voluntary transfer of the title of the thing spoken of as given. That is only the primary signification stated by lexicographers, among more than twenty others ; while the second is, that of transferring or delivering a thing from one person to another. The sense, in which the word is used, must often be ascertained by the connection in which it is used.

The declaration of the intestate to Mr. Willey, that he had given the notes to Mr. Lincoln, as one of several trustees named, does not, when considered alone, fairly convey the idea, that he had made a gift of them to him and others as their own property. But it must be considered in connexion with the language used before, to the same witness, that he had placed notes in Lincoln's hands for those purposes ; and with his language used to Mr. Thurston, at an earlier, and to Mr. Page, at a later time ; and also in connection with his latest and most authentic declaration reduced to writing, as it would be corrected by the witness, and which clearly indicates a disposition of his own property after his decease, by the agency of trustees. There are other considerations leading to the same conclusion, that he did not intend to make a donation to those persons to be held by them as their own property, and that he had not done it. It appears, that he had not fully completed his purpose. Mr. Stickney testifies, that all the notes contained in the schedule, and designed to constitute the fund, had not been placed in the hands of the defendant, that the paper was not signed by him, " because he

wanted to make the sum exactly $5000, and he became more sick soon after and never completed it." The written paper provides, that the proceeds should be distributed according to the judgment " of all or a majority of the above named persons," and the minority might thereby be deprived of all right to any portion of the property, for any purpose. After he had spoken to Mr. Willey of having given the notes to Lincoln, he assumed to exercise a control over the disposition of their proceeds, by the paper made by Mr. Stickney. It is quite certain, that he did not intend, that the persons named as trustees should take any beneficial interest in the property. They were to be the almoners merely of his bounty.

It is said in argument, that " gifts to charitable uses are highly favored in law, and will be most liberally construed, in order to accomplish and carry into effect the intent and purpose of the donor."

This doctrine may apply to gifts, properly of that character, but not to donations made, not in conformity to the statutes of wills and of frauds, but suited to contravene them. Such donations are not favored by the law, but are admitted with the greatest caution. *Ward* v. *Turner*, 2 Ves. Sen. 431 ; *Wells* v. *Tucker*, 3 Binn. 366 ; *Contant* v. *Schuyler*, 1 Paige, 316 ; *Raymond* v. *Sellick*, 10 Conn. 480.

It is also said, that if " the object of the trust be vague and uncertain, it will be declared in ordinary cases, a resulting trust for the heirs-at-law, or distributees; but in case of a gift to charitable uses, this will never be done. In all such cases the legacy will be sustained."

The statute of charitable uses, 43 Eliz. chap. 4, enumerates the devises and bequests, for which it provides ; and it is well settled, that such as are not comprehended in that enumeration, are not aided by that statute. *Morice* v. *The Bishop of Durham*, 9 Ves. 399, and 10 Ves. 522 ; *Saunderson* v. *White*, 18 Pick. 328.

In the former case, the testatrix bequeathed all her personal

estate to the Bishop, upon trust, to pay her debts and legacies, and to dispose of the ultimate residue to such objects of benevolence and liberality, as the Bishop in his own discretion shall most approve of. The case was like the present, in leaving the objects of the charity to the unlimited discretion of the donee. It was decided, that the objects of the trust not being within the statute of Elizabeth, the trust failed. Upon a hearing of the appeal before Lord Eldon, he came to the conclusion, that " it was the intention to create a trust; and the object being too indefinite, failed. The consequence of law is, that the Bishop takes the property upon trust to dispose of it, as the law will dispose of it ; not for his own benefit or any purpose this court can effectuate." He had before stated, " if the testator meant to create a trust, and not to make an absolute gift ; but the trust is ineffectually created, is not expressed at all, or fails, the next of kin take. On the other hand, if the party is to take himself, it must be on the ground according to the authorities, that the testator did not mean to create a trust, but intended a gift to that person for his own use and benefit ; for if he was intended to have it entirely in his own power and discretion, whether to make the application or not, it is absolutely given."

In this case, therefore, if it could be considered, that the intestate did intend to part with the dominion of the property absolutely and to create a trust, it could not be supported, even if there had been a declaration of it made in writing. The objects of it would have been too vague and uncertain, and it could have derived no aid from the statute of Elizabeth. If the persons named as trustees could take the property as an absolute gift, they would be directly interested in the event of this suit, and their testimony introduced by the defendant, must be excluded. This would leave the case to rest upon the testimony of William Stickney alone, and that clearly fails to establish any title to the notes, in the defendant, and those for whom he claims to hold them.

In whatever aspect the case may be viewed, either as presenting a gift *inter vivos*, or a *donatio mortis causa*, or as an

attempt to make a testamentary disposition, without the requisite forms of law, the defence fails.

*Defendant defaulted.*